**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JERZY ADAS and ADAS CONSTRUCTION INC, | ) ) ) | |
| Debtor-Appellants, | ) ) | No. 13 C 2517 |
| v. | ) ) | Hon. Virginia M. Kendall |
| ZENON RUTKOWSKI, | ) ) | |
| Plaintiff-Appellee. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Debtor-Appellants Jerzy Adas and Adas Construction Inc. appeal to this Court, which has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1), from a decision of the United States Bankruptcy Court holding that Adas's debt to Zenon Rutkowski arising from their construction partnership is nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(4) because Adas owed Rutkowski a fiduciary duty. *See In re Adas*, 488 B.R. 358 (Bankr. N.D. Ill. 2013). Bankruptcy plaintiff and appellant Rutkowski filed a cross-appeal arguing that the bankruptcy court erred in finding that no express trust existed between Adas and Rutkowski and in declining to award Rutkowski damages. For the reasons stated below, the bankruptcy court's decision is affirmed in part, reversed in part, and remanded in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court adopts the relevant facts as set forth by the bankruptcy court. *See* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be

set aside unless clearly erroneous . . . .").  The facts summarized below were discussed in depth by the bankruptcy court and are not disputed by the parties.  *Adas*, 488 B.R. at 362–70.

Adas left Poland in 1992 with several years of construction experience under his belt.  In 1995, he and a partner founded A&L Construction, a business focused on remodeling, painting, and constructing additions to buildings and homes.  He became the sole owner of the business in 1997 and changed the name to Adas Construction.  In 1998, Adas expanded into home building when he constructed his own house in Glenview, Illinois.  He built two more houses between 2000 and 2003.

Adas and Rutkowski met in 2003 or 2004 at the school their children attended.  They became close social friends, spending holidays and vacations together.  Rutkowski was also an immigrant from Poland and held jobs in the United States as a security guard, a machine operator, and a tool and die designer.  Rutkowski had no background in construction.  Adas and Rutkowski began discussing real estate investment in 2005.  Although Rutkowski had no experience in construction or real estate (aside from selling his own condominium and buying a house), he did have money available to invest.  Rutkowski testified before the bankruptcy court that:

> What I recall, for example, is that in [Adas's] house—and the neighbor was actually building a house.  He [Adas] took me over.  There was only—basically a—you know, the foundation was only there.
>
> He [Adas] explain to me everything, what's about, where supposed to—you know, what kind—what kind of wall supposed to go, where would be the brick laid out, and what's, you know, the excavation and so about—so he knew the, you know, construction of the houses very well.  I was actually surprised at that time that he knew it that well, and I was really reassured.

Adas was looking to begin construction on two more houses at around that time and was considering potential locations in Lake Bluff, Illinois. Adas did some independent research and took Rutkowski to view some properties on two occasions; Rutkowski had never heard of Lake Bluff before these trips.

Adas eventually settled on two properties, one on Plaister Street that he eventually bought with an individual named Andrzejuk, and another on Safford Place. Adas pitched the Safford property to Rutkowski as a potential site for an investment house, stating that it would be a good deal at any price below $300,000. They purchased the property on August 26, 2005 for $280,000. Their plan was to tear down the house that was currently located on the property and build a new one. Adas would do all the building and construction without charging a general contractor fee, as well as contribute half of the $50,000 required for the down payent. Rutkowski would pay whatever was needed for construction, which he assumed would be approximately $150,000. They would then split whatever profit they made once the house was sold, which Adas expected to be between $100,000 and $150,000 in total. Both Adas and Rutkowski were listed as buyers on the contract, but because Adas "had a lot of debt," Rutkowski was listed as the sole owner of the house and would be responsible for the mortgage. Adas negotiated the purchase price for the house and arranged for the mortgage from Fifth Third Bank.

Adas believed he and Rutkowski were partners. They shook hands on the deal, but no written partnership agreement was signed. Adas then began construction on the house on Safford Street, and at the same time began construction on his other project on Plaister Street. Rutkowski knew Adas was running both projects at the same time. Adas and Rutkowski soon realized they would need more money for construction, so Adas set up a meeting with a

mortgage broker, Paul Darski, with whom Adas had worked on other projects. Darski estimated that construction would cost $400,000 and take one year, and that Adas and Rutkowski would also need $224,000 to pay off the mortgage with Fifth Third Bank. Darski eventually helped them obtain a $440,500 construction loan from Delaware Place Bank, which closed on November 10, 2006. Adas did not explain the $440,500 figure to Rutkowski, and Darski was not called to testify in the bankruptcy court's trial.

According to Adas, the size of construction loan was meant to cover the cost of the work Adas said he had already done on the Safford house. In conjunction with obtaining the loan, he submitted a "Sworn Statement for Contractor and Subcontractor to Owner & Chicago Title" (the "Sworn Statement") stating that $440,500 had been furnished for construction. The Sworn Statement also itemized those expenses. The notary public who signed the Sworn Statement was Darski, Adas's mortgage broker. At trial, Adas admitted that many of the amounts in the Sworn Statement were inflated or exaggerated:

| Type of Work | Cost on Sworn Statement | Actual Cost |
|---|---|---|
| Demolition | $36,000 | $4,400 |
| Waste Removal | $24,000 | $9,500 |
| Carpentry | $99,000 | Per his trial testimony, Adas "did not" pay anyone individually or in total this amount for carpentry |
| Excavation | $38,000 | $8,000 |
| Foundation | $79,000 | $30,000 or $34,000 |
| Lumber | $48,000 | Per Adas's trial testimony, "Not close" to this amount |
| Roofing | $36,000 | $7,000 |
| Windows | $55,000 | $21,300 or $21,400 |
| Plans | $10,000 | $6,000 |

Excluding Carpentry and Lumber (because Adas did not testify as to definitive figures for these types of work), Adas estimated the amount he spent on construction at $278,000, while the actual

cost was closer to $90,300—a difference of $187,700. The $440,500 construction loan was in Rutkowski's name.

Adas agreed that the money from this loan and the money provided by Rutkowsi would be used exclusively for the Safford house, and not on his other projects or his personal mortgage and expenses. He testified:

> Q:    You told [Rutkowski], didn't you, that you would use that money just for the construction of Safford; isn't that right?
>
> A:    Yes.
>
> Q:    That you wouldn't take any contractor's fee?
>
> A:    Yes.
>
> Q:    You wouldn't use it for your family expenses?
>
> A:    Yes.
>
> Q:    You wouldn't use it to pay your home mortgage?
>
> A:    Yes.
>
> Q:    And was the same true with the money that [Rutkoswki] was investing?
>
> A:    Yes.
>
> Q:    So every penny you received was to be used for the construction of Safford and nothing else?
>
> A:    Yes.

Rutkowski would not have gone ahead with the construction loan if he knew Adas would use those funds for anything other than the Safford house.

After the loan was initially approved, Adas continued submitting inflated amounts on subsequent Sworn Statements to draw on it. Rutkowski would not have signed anything at the closing of the $440,500 mortgage if he knew Adas was submitting inflated estimates. Instead, he would have sought advice from someone else, or hired an attorney. Rutkowski did not hire an attorney because Darski told him doing so would be a waste of money.

The Delaware Place Bank loan officer, Sharon Liska, would not have approved the draws on the loan if she knew Adas was submitting inflated requests. Although Liska or a third party hired by Delaware Place Bank would occasionally visit the Safford house to determine that the work described in the Sworn Statements was actually being completed, the actual cost of that work could not be verified. This is because Adas "funnel[ed]" everything through his company and told Liska that he did not hire any contractors. Only one disbursement request was rejected.

Rutkowski's signature on Sworn Statements submitted to the Delaware Place Bank to draw $256,500 was forged. James Hayes, a forensic document examiner, testified at trial that the signature on those Sworn Statements did not belong to Rutkowski. But he did not conclude that Adas or Darski was the forger. The first time Rutkowski saw the Sworn Statements Adas submitted was when his attorney produced them for him, although Rutkowski did receive monthly account statements from Delaware Place Bank.

Adas completed the Safford house in April of 2008, and an appraisal on April 1, 2008 valued the house at $950,000. A certificate of occupancy was issued several months later, in June 2008. However, at the outset of their agreement, Adas told Rutkowski that the house would only take one year to build. As such, Rutkowski grew concerned when Adas did not finish construction by the end of 2007. Between the end of 2007 and August 2008, Rutkowski asked Adas for an accounting of the amount of money he received to build the house five times. Adas eventually produced a signed statement acknowledging that he received $603,200, and an accompanying five-page handwritten document that could only account for between $454,767.90 and $457,767.90 in actual costs for building the Safford house. This is a difference of between $145,432.10 and $148,432.10. Adas "said nothing" when Rutkowski asked him where that money went. Rutkowski then asked Adas for a professional accounting but never received one.

A professional accounting would be difficult because Adas commingled his personal and business funds. For example, Adas deposited a check for $128,905.92 from his business partner on the Plaister house into his personal account. In addition, on April 18, 2006, Rutkowski wrote a check to Adas for $16,000 that Adas deposited it into his personal account. Adas also paid himself $188,640.36 and $106,330 from his business accounts in November 2006, shortly after the construction loan from the Delaware Place Bank for the Safford house was funded. He continued writing checks to himself from his business accounts to pay for personal expenses, such as his wife's attorney for her personal bankruptcy, even though his "business was beginning to fade."

A formal accounting would also be difficult because Adas's record keeping was irregular and inconsistent. Adas's general practice was to write the name of the project the check was for on the face of the check. If he wrote the names of both Plaister and Safford, the cost was allotted between the projects. However, Adas altered the checks he produced for discovery—some of the checks that listed both projects on the copy submitted to the bank had been altered to cross out "Plaister." He did this on four checks totaling $29,130.28. For his employees' records, Adas kept track of their hours and whether they had been paid, but made no withholdings for federal income tax, state income tax, Social Security, or Medicare. He did not pay overtime. Adas's practice regarding expenses was similar to his practice with checks: he would write Safford or the name of another job on the back of receipts from stores like Home Depot. Although Adas still has the original receipts, he only produced copies of the front. Adas claims the receipts produced reflect purchases for the Safford house, but the location of the stores on these receipts were frequently far from that site but close to his other projects, and the date and time often listed days when Adas and his employees were working on the other projects.

Adas and Rutkowski attempted to sell the house through Alicia Anderson, a real estate agent with Coldwell Bank in August of 2008. (Dkt. No. 9-22 at p. 45.) Although Rutkowski considered himself the sole owner of the house at that point, he toured the house with Adas (who had at some point changed the locks on the house) and Anderson to aid in their discussions regarding the price they should seek. (*Id.* at pp. 46–47.) Although Anderson suggested listing the property at a lower price, Adas disagreed and the Safford house was listed at $898,000. (Dkt. No. 9-23 at pp. 9–10.) Rutkowski eventually ended the listing agreement with Anderson and attempted to sell the house on his own but ultimately failed. (*Id.* at pp. 24–25.) The house was ultimately foreclosed on the home and obtained a deficiency judgment against Rutkowski for $142,000. (Dkt. No. 9-22 at p. 48.) Adas's business also failed and he filed for bankruptcy in 2009. (Dkt. No. 9-18 at pp. 15–16.) Rutkowski filed this adversary proceeding regarding Adas's debt to him, and a trial was held on that issue beginning on November 8, 2011. (Dkt. No. 9-18 at p. 2.) The bankruptcy court ruled on the nondischargeability issue on March 7, 2013, and Adas filed the present appeal with this Court on April 4, 2013.

## STANDARD OF REVIEW

This Court has jurisdiction to review final bankruptcy court decisions. 28 U.S.C. § 158(a)(1); Fed. R. Bankr. P. 8001 and 8002. On appeal, a district court reviews a bankruptcy court's factual findings for clear error, and its legal conclusions *de novo*. *See Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994); *In re Mayer*, 173 B.R. 373, 377 (N.D.Ill. 1994). If the bankruptcy court correctly states the law, "its determination of whether the facts met the legal standard will be disturbed only if it is clearly erroneous." *In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011) (citing *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006)).

# DISCUSSION

## I.    Nondischargeability under 11 U.S.C. § 523(a)(4)

### A.    Standard

Under 11 U.S.C. § 523(a)(4), "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ."  In order for a debt to be nondischargeable under any of the subsections of 11 U.S.C. § 523, the creditor bears the burden of proving the applicability of one of the statutory provisions by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279 (1991); *Matter of Bero*, 110 F.3d 462 (7th Cir. 1997).  "[E]xceptions to discharge of a debt are construed strictly against a creditor and liberally in the debtor's favor," *Kolodziej v. Reines* (*In re Reines*), 142 F.3d 970, 972–73 (7th Cir. 1998), particularly under § 523(a)(4).  *In re Berman*, 629 F.3d at 767 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).  To establish nondischargeability under § 523(a)(4), a creditor must show (1) that an express trust or fiduciary relationship existed between the debtor and creditor, and (2) that the debt was caused by fraud or defalcation.  *See Berman*, 629 F.3d at 766; *In re Wish*, 472 B.R. 763, 783 (Bankr. N.D. Ill. 2012).

### B.    Express Trust

Although federal law defines a "fiduciary," state law takes on added importance in determining whether a specific case involves an "express trust."  *In re Marchiando*, 142 B.R. 246, 249 (N.D. Ill. 1992) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334 (1934)).  Under Illinois law, an express trust exists where there is:

> (1) intent to create a trust;
> (2) definite subject matter or trust property;
> (3) ascertainable beneficiaries;

> (4) a trustee;
> (5) specifications of a trust purpose; and
> (6) delivery of trust property to the trustee.
>
> If any of the necessary elements of a trust are not described with certainty, no trust is created. Express or technical trusts are formed by positive acts of both parties, typically manifested in writing by a deed, will, or other such agreement.

*In re Boricich*, 2011 WL 2600692, *4 (Bankr. N.D. Ill. June 29, 2011) (citations omitted).

Although typically articulated in a written instrument, the Illinois Supreme Court has held that a writing is not necessary to find an express trust exists: "This character of trust arises from the direct and positive action of the parties. *Those actions may be evidenced by written instrument, words expressed, or both*." *Schaack v. Reiter*, 23 N.E.2d 714, 716 (Ill. 1939) (emphasis added); *Verbaere v. Cmty. Bank of Homewood-Flossmoor*, 498 N.E.2d 843, 848 (Ill. App. Ct. 1986); *Price v. State*, 398 N.E.2d 365, 370 (Ill. App. Ct. 1979); *Samuel v. N. Trust Co.*, 340 N.E.2d 162, 166 (Ill. App. Ct. 1975). An essential element in the creation of an express trust is the parties' intent, which must be proven by "circumstances [that] clearly evidence[] an intention to create a trust." *Schaack*, 23 N.E.2d at 716; *Verbaere*, 498 N.E.2d at 848.

The Illinois Supreme Court's analysis in *Matteson v. Kellogg*, 15 Ill. 547 (1854) is instructive.[1] In *Matteson*, Sylvester Blish gave George Wright $400 to buy land in Vernon, Connecticut. *Id.* Blish explained to Wright that the money belonged to, and the land was being purchased for, Aaron Kellogg, Hubbard Kellogg, and Ralph Talcott. *Id.* at 548. Wright authored a record upon receiving the money: "Received of Sylvester Blish, four hundred dollars for the purpose of procuring a quarter section of timber land for Aaron Kellogg and his friends, in

---

[1] "Even though appellate court decisions issued before 1935 have no binding authority, we view these decisions as persuasive." *N. Shore Cmty. Bank & Trust Co. v. Kollar*, 710 N.E.2d 106, 110 (Ill. App. Ct. 1999) (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1217 (Ill. 1996)); *see also Chi. Title & Trust Co. v. Vance*, 529 N.E.2d 1134, 1138 (Ill. App. Ct. 1988) ("[Illinois] appellate [court] decisions were not of binding authority until the Courts Act was amended in 1935.").

Vernon, Connecticut state.  H. G. WRIGHT.  MONMOUTH, 19th May, 1836."  *Id.*  Wright

never bought the land.  *Id.*  On March 22, 1842, he filed for bankruptcy and his debts were

discharged.  *Id.* at 547.  He died intestate a few months later.  *Id.*  The *Matteson* court considered

whether the $400 debt Wright owed to the Kelloggs (Talcott had since died) could be discharged

in bankruptcy, or whether it was nondischargeable because it arose from defalcation by a

fiduciary.  *Id.* at 548–49.  The court held that giving Wright the money with express instructions

for its use created a trust and a fiduciary duty:

> The money was here placed in Wright's hands for a particular
> purpose, *with no authority to him to use it in his general business,
> or appropriate it any way different from the trust which he
> assumed when he received the money*.  It continued to be the
> principal's money in Wright's hands as much as it was in Blish's
> hands, or even in their own; and *using it in any way different from
> his instructions and his agreement was a breach of the trust which
> he had assumed.*

*Id.* at 549 (emphasis added).  It then went on to state the rule that:

> [W]here one receives the money or property of another as agent* or
> bailee, *the title to which is to remain in the principal*, and which is
> to be paid over or delivered to him, *or to be used in a particular
> way, or for a specific purpose, for his use, that then the money or
> property is received or held in a fiduciary capacity or as trustee*.
> In such a case a special trust and confidence is reposed beyond that
> of mere credit, and it was against the violation of such confidence
> that congress designed to provide by the exception [that debts
> created in consequence of defalcation incurred while the debtor
> was acting as a trustee or in a fiduciary capacity are
> nondischargeable].

*Id.* (emphasis added).

Here, Rutkowski obtained the construction loan and delivered his own funds to Adas "to

be used for the construction of Safford and nothing else."  *In re Adas*, 488 B.R. 364, 366.  Adas

and Rutkowski then shook hands on the deal.  *Id.*  Rutkowski would not have gone through with

the deal or given any money to Adas if he knew Adas would use that money for anything other than building the Safford house. *Id.* at 367. Rutkowski then provided the funds to Adas but was still liable for the construction loan because it was issued under Rutkowski's name using his own credit. (*See* Dkt. Nos. 9-21 at p. 6; 9-22 at p. 78.) Although there was no writing, a written instrument is not required to find an express trust under Illinois law; words and evidence of intent are enough. That Adas stood to benefit from the sale of the Safford house does not alter the status of the funds Rutkowski placed in Adas's trust for the sole purpose of completing construction because Adas's interests were not perfected until that construction was complete. The Court therefore finds that this arrangement created an express trust between Adas and Rutkowski because there was intent to create a trust, a definite subject matter (the Safford house), ascertainable beneficiaries (Rutkowski), a trustee (Adas), specifications of a trust purpose (building the Safford house), and delivery of the trust property to Adas. Any debts arising from Adas's defalcation of these funds is not dischargeable in bankruptcy pursuant 11 U.S.C. § 523(a)(4).

Adas argues in the alternative that no express trust was created under the federal standard. Under federal law, "Express trusts require an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust." *In re Monroe*, 304 B.R. 349, 358 (Bankr. N.D. Ill. 2004) (citing *In re Janikowski*, 60 B.R. 784, 789 (Bankr. N.D. Ill. 1986)). The "hallmarks" of a trust include "segregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most 'bare' legal title to them." *In re Adas*, 488 B.R. at 372 (quoting *In re McGee*, 353 F.3d 537, 540–41 (7th Cir. 2003)). In *McGee*, the debtor was a landlord who misappropriated a tenant's security deposit in violation of Chicago Municipal Code § 5-12-080(a). *In re McGee*, 353 F.3d at 540. The *McGee* court held that the Code's

requirements that "the money must be deposited in an insured account in a financial institution," "the funds remain the tenant's property while on deposit," and "every tenant's deposit must not be commingled with other assets" created a "trust-like" relationship between landlord and tenant. *Id.* As such, the tenant's misappropriated security deposit was not a dischargeable debt under 11 U.S.C. § 523(a)(4). In so holding, Judge Easterbrook noted that:

> A plutocrat who puts an investment account of $500,000 at the disposal of a recent high-school graduate for the latter's discretionary financial management may be acting foolishly but *has created a fiduciary relation (even if not a formal trust)*, and if the manager decides to 'invest' the account in No. 28 on a roulette wheel then § 523(a)(4) will prevent discharge of the debt.

*Id.* at 541 (emphasis added).

A trust existed between Adas and Rutkowski under the federal standard. Rutkowski segregated his funds and provided them to Adas, Adas became the financial intermediary with discretion on how to use the funds to build the Safford house, and Adas had only "bare" legal title to the funds because the construction loan was in Rutkowski's name. Like the plutocrat in the *McGee* court's example, when Rutkowski provided funds to Adas for use in constructing the Safford house, the debts incurred by Adas when he chose to commingle the funds and use them for other purposes are not dischargeable under § 523(a)(4). *See id.*

### C. Fiduciary Duty

Rutkowski argues that the bankruptcy court correctly found a fiduciary relationship between him and Adas. Adas argues the bankruptcy court was incorrect because Adas and Rutkowski were equal partners and that Adas did not have a position of power or ascendancy over Rutkowski.

Whether a fiduciary relationship exists for the purpose of analyzing § 523(a)(4) is a matter of federal law. *In re Berman*, 629 F.3d at 767. The fiduciary relationship exception to nondischargeability is "strict and narrow," and the debtor must have been a trustee or fiduciary before the wrong giving rise to the debt occurred. *Davis*, 293 U.S. at 333. Nondischargeability resulting from a fiduciary relationship can arise when there is a difference in knowledge or power among partners such that one has a position of ascendency over the other or is "incapable of monitoring the other's performance." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). In such situations, the "law does not treat the relation as a relation at arm's length between equals." *Id.*

In *Catrambone v. Adams*, 498 B.R. 839 (N.D. Ill. 2013), the court analyzed whether Catrambone owed a fiduciary duty to Adams, his 50/50 business partner in Great Lakes Building Materials, Inc. ("GLBM"), a business that sold and distributed building materials. *Adams v. Catrambone*, 2010 WL 3893800, at *1 (N.D. Ill. Sept. 30, 2010) (findings of fact from the damages phase of a prior action between the parties on the same fiduciary duty issue arising before Catrambone filed for bankruptcy). While running GLBM, Catrambone engaged in insider dealing and diversion of money. *Id.* Catrambone also wrongfully terminated Adams as an officer, shareholder, and employee of GLBM. *Id.* The 2013 *Catrambone* court found that Catrambone had a fiduciary duty to Adams for the purposes of assessing nondischargeability under § 523(a)(4) because Catrambone had "sole" access to the computer containing the financial information gave him a position of ascendency over Adams. 498 B.R. at 848. Specifically, Adams "could not even access basic information about day-to-day business activities—much less financial records—at [GLBM because he] was responsible for sales while Catrambone retained 'sole access' to the computer with financial information about the

14

business." *Id.* Thus, Adams was in a less powerful position. *Id.* The court's reasoning places a strong emphasis on Catrambone's position of power as it pertains to concealing his defalcation:

> Only Catrambone had access to the computer where critical information about [GLBM] was maintained. Although the partnership was *nominally equal*, Adams's limited access to information rendered him "incapable of monitoring [Catrambone's] performance of his undertaking[s]." This inequality in knowledge and power placed Catrambone in a position of "ascendancy" and imposed a corresponding fiduciary obligation to Adams.

*Id.* at 849 (quoting *Marchiando*, 13 F.3d at 1116) (emphasis added).

Like Adams in *Catrambone*, Rutkowski had "no access" to the financial records that he would need to be analyze to determine if Adas was keeping up with his end of the bargain and only spending Rutkowski's money on the Safford house. There is also evidence that Rutkowski's signature was forged so Adas could draw on the construction loan, and that Adas falsified information in the Sworn Statements to have the draws approved, meaning that Rutkowski effectively had no control over the construction loan that existed in his own name. Rutkowski did see monthly statements from First Delaware regarding the construction loan (including that it was being drawn on), but neither he nor First Delaware Bank could verify *how* that money was being used because Adas kept incomplete records, largely in the form of store receipts, and did not disclose these receipts—some of which he altered before production—to Rutkowski until the commencement of the present lawsuit.

Even if Rutkowski could have reviewed the receipts and Adas's other records, he did not possess the knowledge about construction that would have allowed him to engage in any meaningful auditing. This imbalance of power also continued when construction on the Safford house was complete because Adas still retained nearly exclusive knowledge of how money was

spent on the project—even after he reported his expenditures to Rutkowski, he was unable to account for the difference in the amount he borrowed and the amount he spent, a total of more than $145,000. Although Rutkowski eventually tried to sell the house on his own after the construction was complete, he only did so after attempting to sell it Adas's help. Rutkowski ultimately failed to sell the house at all before the bank foreclosed on it. Based on these facts, the Court finds that Adas had a position of ascendancy over Rutkowski, and that he therefore owed Rutkowski a fiduciary duty that prohibits the discharge of this debt under § 523(a)(4).

Adas argues that *In re Shaf*, 464 B.R. 792 (Bankr. N.D. Ill. 2012) requires the opposite conclusion. In *Shaf*, a real estate developer accepted a large deposit from a custom home buyer even though the developer knew zoning restrictions would significantly delay construction on that home. *Id.* at 794–96. The buyer sued the developer when he realized that the developer withheld information regarding the delay, and the parties settled the lawsuit for $100,000. *Id.* at 796. The developer never paid the full amount and subsequently filed for bankruptcy. *Id.* at 795–96. Without citing to any cases, the *Shaf* court held that the developer was not the buyer's fiduciary. *Id.* at 797. Adas urges that the developer had knowledge that was similarly superior to the buyer's as Adas's was to Rutkowski's, and that a fiduciary duty is similarly absent from the present case. The Court is not persuaded by this argument because the developer and the buyer in *Shaf* had a buyer-seller relationship rather than the partnership Adas concedes he had with Rutkowski. In *Shaf*, the buyer wanted to live in the home and the developer wanted to sell to the buyer; Adas and Rutkowski wanted to build a house and sell it for a profit. *See In re Berman*, 629 F.3d at 771 (7th Cir. 2011) ("[A]n ordinary . . . buyer-seller relationship, without more, is not a fiduciary relationship under section 523(a)(4).").

Adas also argues that *Chapman v. Forsyth*, 43 U.S. (2 How.) 202 (1844) requires this Court to find that no fiduciary relationship existed between Adas and Rutkowski because such a finding would be the exception that swallows the rule. In *Chapman*, the Court analyzed whether a "factor, who retains the money of his principal, is a fiduciary debtor." *Id.* at 208. The factor therein shipped and sold 150 bales of cotton and failed to remit the proceeds of that sale to its principal. *Id.* at 202. The factor then filed for bankruptcy and the debt he owed to his principal was discharged. *Id.* The Court held that the factor did not owe a fiduciary duty to his principal, and the debt was therefore dischargeable. *Id.* at 208. However, key to the analysis in *Chapman* is how the factor-principal relationship existed in 1844. The Illinois Supreme Court elaborated on that point in 1854 in *Matteson*:

> The reason assigned for [the *Chapman* Court's decision that a factor is not a fiduciary debtor] is that, according to the course and usage of the trade, the factor is permitted to carry [the principal's] money into account and mingle it with his own money, whereby it ceases to be the money of the principal and becomes the money of the factor, who becomes debtor to the principal to that amount. If there be an implied agreement between the principal and the factor that the latter may take and use the money in his business till called for, by being thus carried into general account it becomes an ordinary debt, the same as money loaned subject to call.

15 Ill. at 549. In other words, the factor's job tacit description allows the factor to commingle funds and use the principal's money as his own until the principal asks for it back. This is a typical loan situation and not subject to a fiduciary duty by the factor. The *Matteson* court went on to hold that where, as here, the individual receiving the money is not a "factor" and is expressly prohibited from using the principal's money as his own, that a fiduciary relationship is created for the purposes of nondischargeability. *Id.* at 549–50. Therefore, *Chapman*'s limiting language does not apply to Adas and Rutkowski.

### D. Defalcation

Because Rutkowski did not allege that Adas defrauded him, the bankruptcy court analyzed defalcation and found that Adas did defalcate Rutkowski such that his debt to Rutkowski was nondischargeable. The parties do not dispute the bankruptcy court's ruling. However, shortly after Adas appealed the bankruptcy court's decision, the Supreme Court elaborated on the definition of "defalcation" in *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013). This Court now applies that definition to the facts presented by Adas and Rutkowski. When the bankruptcy court decided this case, it correctly stated the law in this circuit that "defalcation requires something more than negligence or mistake, but less than fraud." *In re Adas*, 488 B.R. at 375. In *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013), the Supreme Court defined defalcation to include a deliberate or intentional wrong similar to that required in fraud:

> [Defalcation] requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, *we consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty*. That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

*Id.* at 1759–60 (citations omitted; emphasis added). This Court finds that even in light of this heightened standard, Adas's conduct still rises to the level of defalcation. Not only was approximately $145,000 not accounted for when Adas attempted to reconcile the amount drawn on the construction loan and what he spent on the Safford house, Adas also:

- Grossly inflated the amounts on the Sworn Statements submitted to obtain and draw from the construction loan;

- Produced receipts he alleged reflected Safford house expenses but were purchased on dates that no work was being done on the Safford house at stores not located near the Safford house;

- Failed to withhold income and payroll taxes for his employees;

- Failed to pay his employees overtime;

- Altered evidence that was produced in discovery;

- Deposited checks meant for his business account into his personal account; and

- Withdrew funds from his business account for personal use.

This evidence reflects a conscious effort to obfuscate his actions and demonstrates a conscious disregard or willful blindness to a substantial and unjustifiable risk that his conduct would violate his fiduciary duty to Rutkowski. Indeed, the bankruptcy court correctly found that Adas's conduct was "willful and reckless." This Court therefore finds no reason to upset the bankruptcy court's decision that Adas's actions constituted defalcation, even in light of the new standard set forth by the Supreme Court in *Bullock*.

## II.  Determining Rutkowski's Damages

In his counterclaim, Rutkowski argues that the bankruptcy court erred in denying to award damages in addition to holding that Adas's debt was not dischargeable. The bankruptcy court declined to award damages based on its view that the Supreme Court's ruling in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and a circuit split made doing so questionable from a jurisdictional perspective.

In *In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991), the Seventh Circuit held that it is "preferable to allow bankruptcy courts ruling on the dischargeability of a debt to adjudicate the

issues of liability and damages also." In *Stern*, Vickie Lynn Marshall filed for bankruptcy and in that bankruptcy proceeding E. Pierce Marshall, the son of her deceased husband and Texas magnate J. Howard Marshall II, filed a claim alleging that Vickie's lawyers defamed him by telling the press he engaged in fraud to gain control of his father's assets. 131 S. Ct. at 2600–01. The Supreme Court held that a counterclaim arising under nonbankruptcy law, founded on "a state law action independent of federal bankruptcy law," and based on private rather than public rights cannot be adjudicated by an Article I Bankruptcy Judge even if the counterclaim arises under the bankruptcy court's "core" claim authority. 131 S. Ct. at 2611; *see also In re Boricich*, 464 B.R. 335, 336 (Bankr. N.D. Ill. 2011). This Court agrees with the analysis in *In re Borivich* that *Stern* does not preclude bankruptcy courts from determining liability in the context of adjudicating the rights of debtors and creditors in the nondischargeability context:

> In contrast [with *Stern*, an adversary] proceeding to bar dischargeability of debt due to Plaintiff under 11 U.S.C. § 523(a)(4), claimed to be a core proceeding under 28 U.S.C. § 157(b)(2)(I) but is one in which no party has a right to jury trial. Moreover, this action contrasts with *Stern* in being an action directly under and defined by the Bankruptcy Code to determine nondischargeability rather than being independent of bankruptcy law. That characteristic of the action is not changed because the theory of recovery arose under nonbankruptcy law. Indeed, most claims in the bankruptcy system that require application of [Bankruptcy] Code provisions arise under nonbankruptcy law. The bankruptcy judge often must look to state law and rights as they stood pre-bankruptcy to adjudicate disputes. In *Stern* itself the holding was limited to the debtor's counterclaim and similar actions, namely state law counterclaims that are not resolved in the process of ruling on a creditor's proof of claim.
>
> Stern left intact the authority of a bankruptcy judge to fully adjudge a creditor's claim. In this case, the claim was an adversary proceeding against debtor to bar dischargeability of a debt due to Plaintiff. Therefore, the authority to enter a final dollar judgment as part of the adjudication of nondischargeability, as recognized in *Hallahan*, was not impaired by *Stern*.

> Quite clearly it [is] necessary here to determine the amount of debt in order to determine the debt that is nondischargeable. Therefore, under the clear exception recognized by *Stern*, final judgment is authorized because such resolution is required to resolve the creditor's claim."

464 B.R. at 336–37. *In re Borovich* was not appealed or overturned. Although liability under nondischargeability arises from the concepts of trust and fiduciary duty that have their roots in state law, determining whether a trust or fiduciary duty exists under § 523(a)(4) is a question of federal—and not state—law. *See In re Berman*, 629 F.3d at 767. Determining whether a debt is dischargeable before (or in lieu of) determining what exactly is owed puts the cart before the horse. The Court therefore remands the issue of damages to the bankruptcy court to determine the final dollar amount of Adas's nondischargeable debt to Rutkowski. Because the Court agrees with Rutkowski on this issue, it need not address his request to order the bankruptcy court to issue findings of fact and conclusions of law.

## CONCLUSION

For the reasons set forth above, the Court denies Adas's motion to reverse the bankruptcy court's decision regarding his fiduciary duty to Rutkowski, grants Rutkowski's motion to reverse the bankruptcy court's decision that no express trust existed between Adas and Rutkowski, and remands for further review consistent with this Court's opinion the bankruptcy court's declination to define and award Rutkowski damages.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: December 30, 2013